

U.S. Department of Justice

United States Attorney
Eastern District of New York

JPL/TJT:PJC
F. #2022R00445

271 Cadman Plaza East
Brooklyn, New York 11201

May 15, 2024

**TO BE FILED PARTIALLY UNDER SEAL**

By ECF

The Honorable William F. Kuntz II
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Vladislav Kotlyar
                  Criminal Docket No. 23-75 (WFK)

Dear Judge Kuntz:

      The government respectfully submits this letter in anticipation of sentencing in the above-referenced case, which is currently scheduled for May 17, 2024, and in response to the defendant's sentencing submission (the "Defendant's Submission"). On March 16, 2023, defendant Vladislav Kotlyar pleaded guilty before Your Honor to mail fraud, in violation of 18 U.S.C. § 1341, in connection with his role in a scheme to use the mail to submit false and fraudulent claims for specialty baby formula and to defraud health insurers of approximately $1.9 million. (ECF No. 7 (the "Information").) In light of the seriousness of the offense and the harm caused to the health insurance programs, and in order to provide general deterrence and promote respect for the law, the government respectfully submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") range of 27 to 33 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing. See 18 U.S.C. § 3553(a). The government also respectfully requests that the Court order the defendant to pay restitution in the amount of $738,724.30 and to forfeit $932,789.00.

I.     Background and Criminal Conduct

      As charged in the above-referenced Information and described in the Presentence Investigation Report ("PSR"), between approximately March 2019 and October 2022, Kotlyar engaged in a scheme whereby he obtained medical records and prescriptions for infants in need of specialty formula due to allergies and food sensitivities and submitted those to insurance companies so that he could obtain and sell the specialty formula for a profit. (PSR ¶¶ 4-5.) In

some instances, the infants were prescribed traditional formula, and Kotlyar forged the paperwork so that insurance would cover and provide specialty formula. (See id. at ¶ 5.) To increase his profits, Kotlyar also frequently called the insurance companies, impersonated the infants' fathers on recorded lines, and reported that the wrong formula was delivered or that the formula arrived damaged and unusable. (Id. ¶ 8.) This caused the insurers to ship additional formula at no cost to the insured, but at a cost to the insurer. (Id.) Kotlyar also created numerous email addresses in the names of the infants and communicated with the insurers regarding damaged and incorrect shipments through those email addresses.

A significant portion of the specialty formula was shipped directly to Kotlyar in the name of the infants' parents at one of two addresses associated with Kotlyar. (See id. ¶ 6.) Once he received the specialty formula, Kotlyar sold it, pocketing the profits. A portion of the scheme occurred while the United States experienced a national shortage on baby formula, leading to the President invoking the Defense Production Act to increase national supply.[1]

On March 16, 2023, Kotlyar pleaded guilty to the Information. (ECF No. 9.)

II.   The Guidelines Calculation

The government agrees with the Guidelines calculation in the PSR, which is as follows:

| | |
|---|---|
| Base offense level (U.S.S.G. §§ 2B1.1(a)) | 7 |
| Plus: Loss exceeding $1.5 million (U.S.S.G. § 2B1.1(b)(1)(I)) | +16 |
| Less: Acceptance of responsibility (U.S.S.G. § 3E1.1(a), (b)) | -3 |
| Total: | 20 |

The PSR was prepared prior to the zero-point offender provision in Guidelines Section 4C1.1(a) taking effect, which provides for a further two-point reduction for defendants who have no prior criminal history and do not meet enumerated exclusionary criteria. The defendant is entitled to this reduction, and therefore his total adjusted offense level is 18. With a criminal history category of I and a total offense level of 18, the defendant's Guidelines range of imprisonment is 27 to 33 months.

The defendant stipulated in his plea agreement that the intended loss was at least $1.5 million and that the actual loss exceeded $550,000. (Plea Agreement ¶ 2.) The Defendant's Submission argues at length that the Court should not apply the intended loss because the term

---

[1]   See Press Release, The White House, President Biden Announces First Two Infant Formula Defense Production Act Authorizations (May 22, 2022), available at https://www.whitehouse.gov/briefing-room/statements-releases/2022/05/22/president-biden-announces-first-two-infant-formula-dhttps://www.whitehouse.gov/briefing-room/statements-releases/2022/05/22/president-biden-announces-first-two-infant-formula-defense-production-act-authorizations/efense-production-act-authorizations/ (last accessed May 3, 2024).

2

"loss" in the Guidelines is unambiguous and courts have rejected the Guidelines commentary applying intended loss. (Defendant's Submission at 4-8 (citing, among other authorities, Kisor v. Wilkie, 139 S. Ct. 2400 (2019) and United States v. Banks, 55 F.4th 246 (3d Cir. 2022).) As explained below, this argument should be rejected.

   Application Note 3(A) to Section 2B1.1 of the Guidelines provides that in determining the loss under subsection (b)(1), the "loss is the greater of actual loss or intended loss." In Stinson v. United States, 508 U.S. 36, 45 (1993), the Supreme Court held that Guidelines commentary "must be given controlling weight unless it is plainly erroneous or inconsistent with" the Guidelines text. In Kisor, the Supreme Court held that a district court should defer to an agency's authoritative interpretation of its own regulation if: (1) the court determines the regulation is "genuinely ambiguous" after "carefully consider[ing] the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on"; and (2) the agency's reading is "within the zone of ambiguity the court has identified after employing all its interpretive tools." 139 S. Ct. at 2415-16. There is a Circuit split regarding whether Kisor has overruled the holding of Stinson. As the Fifth Circuit has noted:

> Some of our sister circuits contend the Supreme Court replaced Stinson's highly deferential standard with a less deferential one in Kisor v. Wilkie, . . . . See United States v. Nasir, 17 F.4th 459 (3d Cir. 2021) (en banc); United States v. Campbell, 22 F.4th 438 (4th Cir. 2022); United States v. Riccardi, 989 F.3d 476 (6th Cir. 2021); United States v. Castillo, 69 F.4th 648 (9th Cir. 2023); United States v. Dupree, 57 F.4th 1269 (11th Cir. 2023) (en banc). Others disagree and continue to apply Stinson. See United States v. Lewis, 963 F.3d 16 (1st Cir. 2020); United States v. Tabb, 949 F.3d 81 (2d Cir. 2020); United States v. Moses, 23 F.4th 347 (4th Cir. 2022); United States v. Smith, 989 F.3d 575 (7th Cir. 2021), cert. denied, — U.S. —, 142 S. Ct. 488, 211 L.Ed.2d 295 (2021); United States v. Maloid, 71 F.4th 795 (10th Cir. 2023). We agree with the second group. Stinson sets out a deference doctrine distinct from the one refined by Kisor. Until the Supreme Court overrules Stinson, then, our duty as an inferior court is to apply it faithfully.

United States v. Vargas, 74 F.4th 673 (5th Cir. 2023). It appears that in the Second Circuit, Stinson is still considered to be good law. In United Staes v. Wynn, 845 F. App'x 63, 66 (2d Cir. 2021), the Second Circuit rejected the argument that Kisor undermined United States v. Jackson, 60 F.3d 128, 131 (2d Cir. 1995), which held that Application Note 1 to Guidelines Section 4B1.2 is authoritative because it interprets and explains 4B1.2. See also United States v. Richardson, 958 F.3d 151, 154 (2d Cir. 2020) (finding that Application Note 1 is not inconsistent with a plainly erroneous reading of 4B1.2); United States v. Chalas, No. 22-3189, 2024 WL 878905 (2d Cir., March 1, 2024) (defendant unsuccessfully argued Kisor undercut Stimson such that it was plain error for district court to calculate Guidelines range, citing Jackson and Richards).

   With respect to intended loss under Application Note 3(A)(ii) to Section 2B1.1 of the Guidelines, the "Second Circuit has a long history of applying and passively adopting the

3

disputed commentary on intended loss." United States v. Williams, 2023 WL 2613503, at *7 (Mar. 23, 2023 D. Conn.) (citing cases).  The Second Circuit has expressly relied on Stinson in doing so.  United States v. Lacey, 699 F.3d 710, 717-18 (2d Cir. 2012) ("Application Note 3(A) to [2B1.1] (which, under Stinson, is binding unless an unreasonable interpretation of the Guideline or contrary to law, see 508 U.S. at 45, 113 S. Ct. 1913) defines 'loss' as 'the greater of actual loss or intended loss.' U.S.S.G. § 2B1.1 app. note 3(A)(i).").  And that history now extends post-Kisor.  United States v. Powell, 831 Fed. App'x. 24, 25 (2d Cir. Dec. 15, 2020) ("For the purposes of calculating the Guidelines range, loss is defined as 'the greater of actual loss or intended loss.'" (quoting U.S.S.G. § 2B1.1 cmt. 3(A)).  Likewise, this Court recently applied the intended loss commentary to the Guidelines post-Kisor.  United States v. Jean, Cr. No. 20-51 (WFK), 2024 WL 862357, at *6-7 (E.D.N.Y. Feb. 29, 2024) (finding defendant accountable for intended loss in connection with sentencing for wire fraud conspiracy).

       Finally, to ensure consistent loss calculation across circuits, the United States Sentencing Commission recently decided in April 2024 to move the "intended loss" commentary into the Guidelines to eliminate any ambiguity that the Guidelines mean to apply intended loss. 89 Fed. Reg. 36853, 36855-57 (amending U.S.S.G. § 2B1.1(b)(1) in response to Banks' application of Kisor).[2]  The defendant's reliance on these cases is therefore misplaced and the Court should adopt the Guidelines calculated in the PSR.



---

[2] Absent Congressional action, these amendments will take effect later this year.

IV.      A Guidelines Sentence of Incarceration is Appropriate

    A.      Legal Standard

In <u>United States v. Booker</u>, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 543 U.S. 220, 245 (2005); <u>see</u> 18 U.S.C. § 3553(a). Subsequent to <u>Booker</u>, the Second Circuit has held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." <u>United States v. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005). Although the Second Circuit declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, it cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." <u>Id.</u> at 113.

Subsequently, in <u>Gall v. United States</u>, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." <u>Gall</u>, 552 U.S. at 49 (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the facts presented." <u>Id.</u> at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides numerous factors that the Court must consider in sentencing the defendant. These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment, (b) afford adequate deterrence to criminal conduct, (c) protect the public from further crimes of the defendant, and (d) provide the defendant with appropriate education or vocational training; (3) the kinds of sentences available; (4) the Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution.

    B.      Application of Law

The government respectfully requests that the Court impose a sentence of 27 to 33 months' imprisonment because such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing. <u>See</u> 18 U.S.C. § 3553(a). Specifically, the circumstances of the offense in this case, the history and characteristics of the defendant, the need to promote respect for the law and provide just punishment, and the need for specific and general deterrence warrant a custodial sentence within the advisory Guidelines range.

1. <u>The Nature and Circumstances of the Offense, the History and Characteristics of the Defendant, and the Need to Promote Respect for the Law Require a Guidelines Sentence</u>

There is no dispute that scheming to defraud health insurers using the mail and through submitting fraudulent claims for specialty baby formula is a serious crime. The crime was made all that more serious by the country's then-national baby formula shortage. The defendant enlisted young parents to turn over sensitive personal information about their infant children so that he could turn a profit by forging medical documents and lying to insurance companies. His lies were repeated and multi-layered: he lied about what formula was prescribed by forging prescriptions, he lied about who he was by impersonating the infants' parents over the phone and by email, and he lied about what he received by telling insurance companies that formula arrived damaged or was incorrect based on what was ordered. He chose, over and over, to engage in deception to line his own pockets. This serious offense requires serious punishment.

Since his guilty plea, the defendant has taken several commendable steps towards rehabilitation, including donating over $300,000 in baby formula that he illegally obtained and which law enforcement declined to seize lest it go to waste as seized evidence. (<u>See</u> Defendant's Submission at 14.) But these recent efforts stand in stark-contrast to his multi-year pattern of pretending to be dozens of parents to extract money from insurance companies. While the defendant may have saved his ill-gotten gains, <u>id.</u> at 11, that does not detract from the fact that, at the time, he was taking specialty formula from those who actually needed it and increasing the costs for others in the market. He had a well-paying job and a family, and his actions were not borne out of necessity. His greed took over when he turned a part-time job selling legitimately obtained excess formula into a fraud that involved impersonating parents. (<u>Id.</u> at 13.)

Crimes targeting health insurance programs are detrimental to society because they constrain limited resources and create barriers for those who need medical services. Indeed, in this particular case, the defendant diverted scarce specialty formula from those who needed it so that he could insert himself into the supply chain and make a profit. The implementation of safeguards to prevent schemes like this, for example by more thoroughly verifying parents' identities and vetting damaged shipment reports, adds delay to the process and adds costs for the insurers, who will undoubtedly pass those on to the insured through higher premiums. The defendant committed this fraud with full awareness of what parents experience when their infants require specialty formula—he knew about this industry based on his own experiences with his children. (<u>Id.</u> at 12.) Schemes with such wide-ranging effects undermine faith in the health care system, deplete health care program resources, and add to health care costs. They require serious punishment to promote respect for the law.

2. <u>A Guidelines Sentence Affords the Necessary General Deterrence</u>

There appears to be little need for specific deterrence, given the defendant's age, lack of criminal history, and his extensive efforts to engage in rehabilitation and community service since his guilty plea. Yet general deterrence is a paramount consideration in white collar cases such as this.

6

As the Second Circuit has noted, significant sentences are particularly appropriate in white collar crimes to promote general deterrence. See, e.g., United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013) (noting that some feel that white collar crimes are a "game worth playing"). "'Persons who commit white-collar crimes like [d]efendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of punishments that may be imposed. A serious sentence is required to discourage such crimes.'" United States v. Vrancea, 136 F. Supp. 3d 378, 392 (E.D.N.Y. 2015) (quoting United States v. Stein, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) (Weinstein, J.)). Too often, white-collar defendants point to their community involvement and their ability to satisfy monetary penalties as a basis for courts to give them a pass for significant economic crimes. Indeed, the Defendant's Submission suggests that the significant monetary penalties the defendant faces and the collateral consequences of losing his career are sufficient for general deterrence in this case. (Defendant's Submission at 17.) Accepting these arguments only confirms the Second Circuit's concerns that letting economic crimes go largely unpunished only leads to more fraud by those who calculate that it is worth the risk. For these reasons, the Court should reject the defendant's request for home confinement and impose a Guidelines sentence to show the public that white collar crimes are serious crimes that defendants cannot pay their way out of.

V.   Restitution and Forfeiture

Under 18 U.S.C. § 3663A, the Court shall impose restitution. In United States v. Zangari, 677 F.3d 86, 93 (2d Cir. 2012), the Second Circuit held that restitution must be measured according to the victim's actual loss, not the defendant's gain. Moreover, in calculating restitution, "these losses need not be mathematically precise," and "[a] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable." United States v. Rivernider, 828 F.3d 91, 115 (2d Cir. 2016) (internal quotation marks omitted).

The government respectfully submits that the Court should order the defendant to pay restitution in the amount of $738,724.30 to the insurance entities, consistent with the restitution order filed with the Court and attached to this letter, and which the defendant agreed to pay in his cooperation agreement. (See PSR ¶ 69; Plea Agreement ¶ 1(e).)

In addition, the defendant acknowledged in his plea agreement that he obtained and acquired property that is subject to forfeiture, and he consented to the entry of a forfeiture money judgment in the amount of $932,789.00. (PSR ¶ 71; Plea Agreement ¶¶ 1(g), 6-13.)

7

VI.     Conclusion

        For the reasons discussed above, the government respectfully requests that the Court sentence the defendant Vladislav Kotlyar to 27 to 33 months' imprisonment and order restitution in the amount of $738,724.30 and forfeiture in the amount of $932,789.00.

        Respectfully submitted,

        BREON PEACE
        United States Attorney
        Eastern District of New York

        GLENN S. LEON
        Chief, Fraud Section
        Criminal Division
        U.S. Department of Justice

By:   /s/
        Patrick J. Campbell
        Trial Attorney, Fraud Section
        Criminal Division
        U.S. Department of Justice
        (202) 262-7067

Attachment (proposed restitution order)

cc:     Clerk of Court (WFK) (by email)
        Rick Collins, Esq. (by email)
        Probation Officer Michelle Malko (by email)